UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

04 MAR 29 PM 3:17

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| SUBHASH (STEVE) R. TIWARI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CV 01-B-1635-NE |
| | ) | |
| THOMAS E. WHITE, Secretary of the Army, | ) | |
| | ) | |
| | ) | ENTERED |
| Defendant. | ) | |
| | | MAR 29 2004 |

## MEMORANDUM OPINION

This case is presently before the court on a Motion for Summary Judgment, filed by defendant, Thomas E. White, Secretary of the Army. (Doc. 38.) Plaintiff Subhash ("Steve") R. Tiwari, has sued defendant, his employer, alleging retaliation and discrimination on the basis of race and national origin. (Doc. 23.) Defendant has moved for summary judgment as to plaintiff's claims on the grounds that plaintiff cannot establish a prima face case of retaliation or discrimination, and that he has not established that the articulated reasons for defendant's actions are pretextual.

The parties fully briefed the motion for summary judgment and the court heard oral argument. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that the Motion for Summary Judgment, (doc. 38), is due to be granted and plaintiff's claims are due to be dismissed.

66

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that he is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

2

## II. <u>STATEMENT OF FACTS</u>

### A. General Background Facts

Plaintiff is a naturalized American citizen, born in India. (Doc. 50, Ex. 192.)  In April 1988, plaintiff accepted a position with defendant at the United States Army Ballistic Missile Defense Command in Huntsville, Alabama, the predecessor organization of the Space and Missile Defense Technical Center ["SMDTC"]. (Doc. 39, Ex. 1 at 15.)   Plaintiff became Project Manager for the Kinetic Energy Anti-Satellite ["KE-ASAT"] Program in 1994. (Doc. 39, Ex. 2 at 26.)  Defendant promoted plaintiff permanently to Division Chief in August 1999. (*Id.*)

In 1997, SMDTC contracted with DESE Research, Inc. for the development of image enhancement software to support the KE-ASAT program.  DESE subcontracted with Titan Corporation to provide support to the KE-ASAT program.  (Doc. 39, Ex. 3.)

For most of the relevant time period, William Dobbs, Deputy Director of the Weapons Directorate, was plaintiff's immediate supervisor.  William Reeves, Director of the Weapons Directorate, was plaintiff's second-level supervisor.  (Doc. 39, Ex. 4 at 2.)

Before January 1999, Jess Granone, then Director of the Sensors Directorate, and Reeves reported to Dr. Richard Fisher, then Director of SMDTC.  (Doc. 39, Ex. 5; doc. 39, Ex. 6 at 84.)

Fisher retired in January 1999, and Granone served as Acting Director of SMDTC. (Doc. 39, Ex. 8.)  On March 15, 1999, while serving as Acting Director, Granone introduced a change in the technical control over the KE-ASAT program.  (Doc. 39, Ex. 7.)  Granone

3

decided to move the KE-ASAT Program to the Space Technology Directorate. (*Id.*)

Defendant selected Granone as Director of SMDTC in April 1999. (Doc. 39, Ex. 8.)

## B. Sexual Harassment Allegations Against Plaintiff

In August 1999, Denise Jones, a female engineer working under plaintiff's direct supervision, complained that plaintiff had sexually harassed her.[1] (Doc. 39, Ex. 9 at ¶ 3.) In response to Jones's allegations, Brigadier General Steven Flohr, Deputy Commander of the Space and Missile Defense Command ["SMDC"], appointed Colonel Robert Belton, as an independent investigating officer in accordance with Army Regulation ["AR"] 15-6.[2] (*Id.*) Belton did not know plaintiff or Jones before he began the investigation. (Doc. 39, Ex. 10.) Belton began investigating Jones's allegations in August 1999, and he issued his findings and recommendations on October 4, 1999. (Doc. 39, Ex. 9.) He stated in his report,

> I was to determine whether or not Mr. Subhash (Steve) Tiwari engaged in sexual harassment toward Ms. Denise Jones, a female subordinate GS-14 engineer . . . . [T]here was only [one] incident when Mr. Tiwari may have deliberately made unwelcomed physical contact of a sexual nature toward Ms. Jones. This occurred on 4 June 1999 in Los Angeles, California at a business related social event. Even if this incident occurred as described by Ms. Jones, it would not rise to the level of sexual harassment within the meaning of 10 U.S.C. 1561 and 29 C.F.R. 1604 . . . because it was not sufficiently severe or pervasive and no serious adverse actions were taken against Ms. Jones after she objected. On the other hand, if Ms. Jones'[s] version of this incident is true, Mr. Tiwari may have crossed the line of the Army's anti-sexual harassment policy. For the reasons stated below, I tend to believe Ms. Jones'[s] version. Therefore, this report should be furnished to Mr. Tiwari's

[1] Jones also complained that plaintiff had engaged in travel fraud, and that he had engaged in inappropriate activities with a contractor. (*Id.*)

[2] Army Regulation 15-6, *Procedure for Investigating Officers and Boards of Officers*, at <http://www.usapa.army.mil/pdffiles/r15_6.pdf>.

4

> supervisory chain, recommending that appropriate disciplinary action be taken
> against Mr. Tiwari.  At a minimum, he clearly engaged in inappropriate
> behavior by crossing the line with a female subordinate employee.  In arriving
> at the appropriate charge and penalty, consideration should be given to Mr.
> Tiwari crossing the line in an apparent attempt to interfere with this
> investigation as well as crossing the line in his written denial of any
> wrongdoing by irresponsibly engaging in character assassination of Ms. Jones
> in reprisal for raising a sexual harassment complaint.

(Doc. 39, Ex.  9 at 3 (internal citations omitted).)  The report also stated that a male

subordinate employee, identified as "male #14", reported to Belton that plaintiff had

threatened to shoot him.  (*Id*. at 9.)  Belton also found that plaintiff had threatened to sue

Jones for slander.  (*Id*. at 5.)  Moreover, he found that plaintiff had changed Jones's job

duties, giving her clerical assignments that were not given to other engineers.  (*Id*. at 6.)

Based on his findings, Belton recommended:

> Furnish this report to Mr. Tiwari's supervisory chain, recommending that
> appropriate administrative sanctions be initiated.  In arriving at the appropriate
> charge and penalty, consideration should be given to Mr. Tiwari's apparent
> attempt to interfere with this investigation as well as engaging in a character
> assassination of Ms. Jones in his reply to her complaint.  In addition, Mr.
> Tiwari's supervisory chain should determine whether or not any of Ms.
> Jones'[s] employment conditions have been improperly changed by Mr. Tiwari
> after the June 1999 incident, as she has alleged . . . .  If they were improper,
> corrective action should be taken.

(*Id*. at 3.)

On October 26, 1999, Flohr approved Belton's findings and recommendations, and

he forwarded Belton's report to Granone for action.  (Doc. 39, Ex. 11.)  On or about

October 26, 1999, Granone forwarded the AR 15-6 report with Belton's findings and

recommendations to Reeves for disposition.  (Doc. 45 ¶ 5.)  On February 15, 2000, after

5

conducting his own investigation, Reeves issued his own report, which found no fault with plaintiff's actions. (Doc. 39, Ex. 13.)

After receiving Reeves's recommendation of no action, Granone reviewed the matter. He knew that plaintiff had given Jones secretarial duties and that he had allegedly threatened to shoot one of his male subordinates. (*See* Doc. 39, Ex. 2 at 209-10.) Therefore, Granone believed "there was a hostile environment that was created and perpetuated due to the sexual harassment charges." (*Id.* at 210.)

On April 21, 2000, Granone sent a request to the South Central Region Civilian Personnel Advisory Center, asking them to prepare a memorandum proposing plaintiff be suspended for seven workdays. (Doc. 39, Ex. 14.) On May 2, 2000, Granone notified plaintiff of the proposed suspension. (Doc. 39, Ex. 15.) The specific reason for the proposed suspension was "[c]reating a disturbance resulting in an adverse effect on the morale and productivity of subordinate employees, involving a threat to inflict bodily harm." (*Id.* ¶ 2.) The memorandum stated, "On 4 June 1999, you engaged in inappropriate behavior toward a female subordinate employee (Ms. Denise Jones) and subsequently engaged in reprisal tactics against her because she objected to your behavior toward her." (*Id.*) The memorandum further states, "[Y]ou also threatened to inflict bodily harm against another subordinate employee . . . who had spoken out against you to an investigating officer." (*Id.*)

Plaintiff opposed his suspension. Pursuant to an agreement between the parties, Brigadier General John Urias, who was not assigned to SMDTC, was selected to investigate

6

the proposed suspension and the underlying complaint.  (Doc. 39, Ex. 18.)  The parties agreed that Urias would make a binding recommendation based on his investigation.  (*Id.*)

Based on his review and independent investigation, Urias decided that a seven-day suspension was appropriate.   (Doc. 39, Ex. 16; doc. 47 ¶ 5.)   Urias issued his recommendation on February 28, 2001.  (Doc. 39, Ex. 16.)

On April 30, 2001, Lieutenant General Joseph M. Cosumano reduced plaintiff's suspension to three days.  (Doc. 39, Ex. 19.)  Cosumano had assumed command the day he rendered his decision; he did not know any of the parties before assuming command.  (Doc. 39, Ex. 20 at 8, 10, 17-19.)

## C.  Plaintiff's Transfer off the KE-ASAT Program

During a random audit of SMDTC credit cards in the summer of 1999, the Contracting Office determined that there was a potential impropriety in the expenditure of KE-ASAT contract funds. (Doc. 39, Ex. 3 ¶ 4.)  The Contracting Office requested that the Defense Contract Audit Agency (DCAA) investigate.  (*Id.*)

The DCAA's investigation found an Activity Report from a subcontractor, Titan Corporation, which indicated that DESE, Titan, and plaintiff may have been involved in illegal lobbying.  (*Id.* ¶ 5.)  The Titan Activity Report, (doc. 39, Ex. 21), listed certain activities that Titan had engaged in with regard to the KE-ASAT Program between March 16, 1998 and April 17, 1998, under its subcontract with DESE. (Doc. 39, Ex. 21.) The Titan Activity Report formed the basis for vouchers submitted to the Government for payment. (*Id.*; doc. 46 ¶ 3.)  The Report detailed, *inter alia*, the following activity of plaintiff:

7

• Discussed FY-99 funding with Steve Tiwari and Wally Kirkpatrick and at their request re-drafted the paper on acquisition of booster rockets. Provided the booster paper to Margo Carlisle, asking her to seek Senator Domenici's support for a separate budget add-on for two or three boosters as a New Mexico project . . . . Also asked Margo to seek Senator Cochran's support in the SAC for a $65M add-on for KE ASAT in the FY-99 budget.

• Coordinated with Tiwari, Bill Stiers, Greg Thom of Rep. Young's office, Frank Gaffney, and Pat Ladner (Alaska Aerospace) on support for the vetoed space control programs. . . . Discussed with Thom and Tiwari a planned trip to see the site at Kodiak, Alaska. Arranged meeting in D.C. between Tiwari and Thom.

• At Tiwari's request, drafted a letter from Rep. Young to Senator Stevens, seeking support in the SAC for KE ASAT funding. Also at Tiwari's request, prepared a draft letter to Senator Smith, asking him to add KE ASAT funds for FY-99 as in prior years.

• Drafted press article in support of national missile defense for publication on the 15th anniversary of the announcement of the SDI program. Coordinating with Tiwari, we included a strong recommendation for a second NMD site in Alaska. The article ran when Steve was in Washington, enabling him to take a copy to his meeting with Greg Thom, to show our support for Alaska. . . .

. . .

• Passed to Steve Tiwari and Wally Kirkpatrick an invitation from Greg Thom to join a group planning to visit the space-launch site under construction at Kodiak Island, Alaska. . . .

. . .

• At Tiwari's request, compiled information on what KE ASAT work would be done in FY-99 if $65M is appropriated. . . . The information was sent to Tom Lankford for his use in preparing the justification for FY-99 funding for Senator Smith. Lankford said it was exactly what he needed.

(Doc. 39, Ex. 21 at 1-2.)

8

The auditors determined that the government had paid for Titan Corporation's lobbying efforts on behalf of the KE-ASAT Program. *See Kirkpatrick v. White*, CV 01-JEO-2947-NE, doc. 84 at 2. As a result of this finding, DCAA advised Mark Lumer, Principal Assistant Responsible for Contracting, that it would refer the matter to its criminal investigators and defendant's Criminal Investigation Division. (Doc. 39, Ex. 3 ¶ 3.)

Federal law prohibits contractors from using government funds to pay for lobbying activities. 18 U.S.C. § 1913 provides:

> No part of the money appropriated by any enactment of Congress shall, in the absence of express authorization by Congress, be used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress, a jurisdiction, or an official of any government, to favor, adopt, or oppose, by vote or otherwise, any legislation, law, ratification, policy or appropriation, whether before or after the introduction of any bill, measure, or resolution proposing such legislation, law, ratification, policy or appropriation; but this shall not prevent officers or employees of the United States or of its departments or agencies from communicating to any such Member or official, at his request, or to Congress or such official, through the proper official channels, requests for any legislation, law, ratification, policy or appropriations which they deem necessary for the efficient conduct of the public business . . . .

Likewise, 48 C.F.R. § 31.205-22(a)(3) prohibits billing government contracts for lobbying activities; it states:

> (a) Costs associated with the following activities are unallowable:
>
> . . .
>
> (3) Any attempt to influence (i) the introduction of Federal, state, or local legislation, or (ii) the enactment or modification of any pending Federal, state, or local legislation through communication with any member or employee of the Congress or state legislature (including efforts to influence state or local

9

officials to engage in similar lobbying activity), or with any government official or employee in connection with a decision to sign or veto enrolled legislation . . . .

*Id.*

Lumer showed the Titan Activity Report to Granone. (Doc. 45 ¶ 7.) Based on his review of the Titan Activity Report, Granone decided to remove plaintiff as Director of the KE-ASAT Program during the investigation. (*Id.*)

During a hearing held by the OCI during its investigation of plaintiff's charge of discrimination,[3] Granone testified as to his rationale for transferring plaintiff from the KE-ASAT Program:

> [Lumer] came . . . to me and said that the auditors had found some things that didn't look right and that it was going to be turned over to the CID for investigation. And, they showed me some of the data. Then, at that point I made the decision that because of the severity and the apparent mismanagement, that I needed to move the program to another place.
>
> . . .
>
> The data that was provided to me on the audit provided to the Contracts Office to Mr. Mark Lumer indicated that there [were] some improprieties there in the management of the contract and – or, the management of one of the contracts. And, therefore, I deemed it was best to separate the action away while the investigation was going on and so I moved it. There was a serious enough indications [sic] in the data that there needed to be a separation.

(Doc. 39, Ex. 2 at 199, 201-02.)

_____

[3]The OCI is the Department of Defense's Office of Complaint Investigations. The agency is responsible for investigating complaints of discrimination and retaliation made by employees of the Department of Defense.

In a November 29, 1999, memorandum finalizing Granone's March 1999 decision to transfer the KE-ASAT program, Granone stated that he had not reassigned plaintiff along with the KE-ASAT Program – effectively removing plaintiff from the program – because the evidence indicated that plaintiff had committed improper activities with contractors supporting the KE-ASAT Program.[4] (Doc. 39, Ex. 33.)

At a minimum, the Titan Activity Report indicated that plaintiff may have engaged in lobbying activity without going through the Congressional liaison, the proper channel for such activities. (Doc. 39, Ex. 3 ¶ 6; doc. 45 ¶ 7.) The SMDC policy on Congressional Affairs states:

> The Congressional Affairs Office will be the single focal point for all Congressional affairs with USASSDC to ensure that all responses are consistent with Army and command policies and guidance. All Congressional actions must enter and leave the Command through the Congressional Affairs Office, where they will be processed according to the applicable references, policies, and time frames. If someone is contacted directly (written or verbally for any information that concerns the command) by a Congressional staffer or Member, the Congressional Affairs Office will be notified as soon as possible for appropriate action.

(Doc. 39, Ex. 22.) The SMDC Congressional Affairs office had no record of any of the activities orchestrated by plaintiff as indicated on the Titan Activity Report. (Doc. 45 ¶ 7.)

---

[4]The court notes that, as a result of the CID investigation, DESE and Wallace Kirkpatrick were issued notices of temporary suspension. *See Kirkpatrick v. White*, CV 01-JEO-2942-NE, doc. 84 at 4 (N.D. Ala. Sept. 27, 2002). DESE and Kirkpatrick filed an appeal of their temporary suspension. The court remanded the matter for further administrative proceedings, but noted, "This court cannot conclude as a matter of law at this juncture that no violation occurred." *Id.* at 20.

Prior to August 1999, several individuals had counseled plaintiff regarding the proper methodology for contacting members of Congress. (*See* Doc. 39, Ex. 24 at 12, 17-19, 20-21, 51-60; *see also* doc. 39, Exs. 23, and 25-27.)  Lumer counseled plaintiff on at least two occasions that he had no authority to give a contractor direction and that all directions to the contractor had to go through the Contracting Office. (Doc. 39, Ex. 29.)

Plaintiff contends that his superiors directed him to meet with members of Congress and their staffs in order to obtain budget approval for his program and the programs of others. (Pl. Mem. in Opp. to Def. Mot. for Summ. J., at 2 citing doc. 50, Exs. 2, 3, 9-13, 54-55.) Plaintiff cites the court to several documents that indicate that he had "briefed" members of Congress on behalf of the KE-ASAT Program. (*See* doc. 50, Exs. 2, 9-12.) Nothing in these documents indicates that plaintiff's briefing activity was done outside proper channels or that a contractor billed these activities to the government. (*See id.*) Likewise, the Declarations of William Dobbs, (doc. 50, Ex. 3), and Daniel Lazich (doc. 50, Exs. 54 and 55), do not support plaintiff's assertion that he was directed to meet with members of Congress outside proper channels, or that he was directed to instruct contractors to bill the government for lobbying efforts.  He also cites the court to an Incentive Award Nomination and Approval, dated March 17, 1998, which commends plaintiff for restoring the KE-ASAT Program and increasing its funding.  (*See* doc. 50, Ex. 13 (Nomination of Subhash R. Tiwari for Meritorious Civilian Service Award) at 3.) However, the nomination states that these actions were the result of the program "building two KV's and demonstrating performance through

tests," not because he lobbied Congress outside proper channels and/or instructed contractors to bill the government for lobbying efforts on behalf of the program. (*Id.*)

Plaintiff contends that Mike Cantrell, a white Program Director over the Atmospheric Interceptor Technology Program, lobbied Congress on behalf of the Army and he was not removed from his job. (Pl.'s Mem. in Opp. to Mot. for Summ. J. at 7.)  Plaintiff also contends that defendant did not refer Cantrell for criminal prosecution. (*Id.*)  In February 1998, a general had observed Cantrell at the drinking fountain outside Senator Trent Lott's office. (Doc. 50, Ex. 44 at 9.)  The general was concerned about Cantrell's purpose for being on the "Hill." (*Id.*)  The incident was investigated and Cantrell received a letter of counsel. (*Id.* at 9-10.)  He was also counseled "not to go back to the Hill." (*Id.* at 10.)   No other action was taken against him for this incident. (*Id.* at 11.)

Plaintiff contends, "Scott Larkin, the SMDC Congressional Affairs Officer, used a private contractor, MEVATEC, to support Congressional liaison, spending approximately $2.3 Million in the process.  Mr. Larkin was not disciplined, reprimanded or removed from his position." (Pl.'s Mem. in Opp. to Mot. for Summ. J. at 7.)  Plaintiff offered no citation to the record in support of his assertion that Larkin used a contractor for lobbying purposes or that such contractor was paid with contract funds for his lobbying activity.  Moreover, the court can find no evidence for plaintiff's assertion.

Plaintiff contends, "Jess Granone used MEVATEC contract employees to work matters on 'the hill' without being disciplined, reprimanded or referred criminally." (Pl.'s Mem. in Opp. to Mot. for Summ. J. at 7.)  In support of this assertion, plaintiff cites the court

13

to his Exhibit 69, submitted in opposition to defendant's Motion for Summary Judgment. This exhibit is entitled, "Space and Missile Defense Technology Center – The Road Ahead. (Doc. 50, Ex. 69. )  The document does not mention Granone by name, and it does not indicate that Granone assisted or coordinated billing contractors' lobbying activities to government contracts. (*See id.*) Indeed, nothing in the plain terms of the document indicates that Granone may have been involved in any illegal activity. (*See id.*)

**D.  Plaintiff's EEO Complaints**

On December 28, 1999, plaintiff contacted an EEO counselor and alleged that defendant had discriminated against him on the basis of his race, national origin, and in retaliation for engaging in protected activity. (*See* doc. 39, Ex. 30.)  On March 27, 2000, plaintiff filed a Formal Complaint of Discrimination.   (Doc. 39, Ex. 31.)   The OCI investigation of his complaint began on January 23, 2001, with interviews of numerous witnesses; the investigation was completed on April 11, 2001. (Doc. 39, Ex. 4.)  The OCI report, issued on April 16, 2001, recommended a finding of no discrimination or retaliation. (*Id.*)

### III. <u>DISCUSSION</u>

Based on the stipulation of plaintiff's attorney, plaintiff's claims are as follows:

1.    The claim of race and national origin discrimination in Count One of the Amended Complaint relates to the claim in paragraph 39 that plaintiff was removed as KE-ASAT Program Manager on the basis of plaintiff's race and national origin.

2.    The claim of retaliation in Count Two of the Amended Complaint relates to the claim in paragraph 59 that plaintiff was suspended for three days in retaliation for filing a formal charge of discrimination.

(Doc. 23.) For the reasons set forth below, plaintiff's claims are due to be dismissed with prejudice.

## A. RACE AND NATIONAL ORIGIN DISCRIMINATION/REMOVAL

### 1. Prima Facie Case

To establish a prima facie case of disparate treatment discrimination, plaintiff has the burden to prove (1) he is a member of a protected class; (2) he suffered an adverse employment action, and (3) defendant, his employer, treated similarly-situated employees outside the protected class more favorably. *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002)(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001)).  Defendant contends that plaintiff cannot show defendant treated similarly-situated employees outside the protected class more favorably.

In order to do so, "plaintiff must show that the comparator employees [were] 'involved in or accused of the same or similar conduct' yet [were] disciplined in a different, more favorable manner.'" *Anderson v. WBMG-42*, 253 F.3d 561, 564 (11th Cir. 2001)(quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).  "The most important factors in the analysis are the nature of the offenses committed and the punishments imposed." *Lathem v. Department of Children and Youth Services*, 172 F.3d

15

786, 793 (11th Cir. 1999)(citing *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir.), *opinion modified by* 151 F.3d 1321 (1998).

In this case, Granone removed plaintiff from the KE-ASAT Program while that program and plaintiff were the subject of a criminal investigation into alleged financial improprieties and illegal lobbying. (Doc. 45, ¶ 6.) Plaintiff contends that defendant treated Mike Cantrell, Scott Larkin, and Granone – white employees allegedly involved in inappropriate lobbying – more favorably than him.

### a. Mike Cantrell

As noted above, plaintiff contends that Cantrell lobbied Congress on behalf of the Army; he was not removed from his job; and defendant did not refer Cantrell for criminal prosecution. (Pl.'s Mem. in Opp. to Mot. for Summ. J. at 7.) In February 1998, a general had observed Cantrell at the drinking fountain outside Senator Trent Lott office. (Doc. 50, Ex. 44 at 9.) The general was concerned why Cantrell was on the "Hill." (*Id.*) The incident was investigated and Cantrell received a letter of counsel. (*Id.* at 9-10.) He was also counseled "not to go back to the Hill." (*Id.* at 10.) No other action was taken against him for this incident. (*Id.* at 11.)

Plaintiff's situation was quite different from Cantrell's situation in material and relevant factors. Plaintiff, his program, and some contractors working on the program, were the subject of a criminal investigation occasioned by the results of an outside audit conducted by the Defense Contract Audit Agency [DCAA]. (Doc. 39, Ex. 3 ¶ 4.) The audit had revealed an activity report from a subcontractor that indicated that the subcontractor had

engaged in lobbying activities on behalf of the KE-ASAT Program and that plaintiff had "coordinated" and was otherwise involved in the lobbying activity. (*Id.*; doc. 39, Ex. 21.) The report raised concerns that the subcontractor had billed the government for its lobbying activities, (doc. 46 ¶ 3), which is a violation of federal law, *see* 18 U.S.C. § 1913; 48 C.F.R. § 31.205-22(a).  DCAA referred the matter to its criminal investigators and defendant's Criminal Investigation Division. (Doc. 39, Ex. 3 ¶ 4.)  Granone removed plaintiff from his position as Program Manager for the KE-ASAT Program while the apparent illegal activity was under investigation (Doc. 39, Ex. 33.) Granone specifically told plaintiff that the action to remove him from the KE-ASAT Program was not a "disciplinary action." (*Id.*)

Clearly, the nature of Cantrell's offense and plaintiff's offense are not similar – Cantrell was merely spotted on the Hill and there was no indication that he was involved in potentially criminal behavior by directing or coordinating lobbying activity, for which a contractor billed the government.  Plaintiff was accused of being involved in illegal payments of a contractor's lobbying activities.  Therefore, the court finds that plaintiff and Cantrell are not similarly situated for purposes of establishing a prima facie case of discrimination.

### b. Scott Larkin

Plaintiff contends, "Scott Larkin, the SMDC Congressional Affairs Officer, used a private contractor, MEVATEC, to support Congressional liaison, spending approximately $2.3 Million in the process.  Mr. Larkin was not disciplined, reprimanded or removed from his position." (Pl.'s Mem. in Opp. to Mot. for Summ. J. at 7.)  As previously discussed, plaintiff offered no citation to the record in support of his assertion that Larkin used a

contractor for lobbying purposes or that such contractor was paid with contract funds. Moreover, the court can find no evidence for such assertion.

Therefore, the court finds that plaintiff and Larkin are not similarly situated for purposes of establishing a prima facie case of discrimination.

### c. Jess Granone

Plaintiff contends, "Jess Granone used MEVATEC contract employees to work matters on 'the hill' without being disciplined, reprimanded or referred criminally." (Pl.'s Mem. in Opp. to Mot. for Summ. J. at 7.) In support of this proposition, plaintiff cites the court to Exhibit 69, submitted in opposition to defendant's Motion for Summary Judgment. This exhibit is entitled, "Space and Missile Defense Technology Center – The Road Ahead. (Doc. 50, Ex. 69. ) The document does not mention Granone by name and it does not indicate that Granone assisted or coordinated billing contractors' lobbying activities to government contracts. (*Id.*) Indeed, nothing in the plain terms of the document indicates that Granone was involved in any illegal activity. (*Id.*)

Therefore, the court finds that plaintiff and Larkin are not similarly situated for purposes of establishing a prima facie case of discrimination.

Based on the foregoing, the court finds that plaintiff has not established a prima facie case of discrimination with regard to his removal as Program Manager for the KE-ASAT Program. Thus, defendant's Motion for Summary Judgment is due to be granted and plaintiff's discrimination claim based on his removal as Program Manager will be dismissed.

18

## 2. Pretext

In view of the court's holding on defendant's failure to present a prima facie case, it need not address the issue of pretext. Nonetheless, it provides another basis for dismissal. For purposes of discussion only, the court will assume that plaintiff can establish a prima facie case of discrimination with regard to his removal. Therefore, the burden shifts to defendant to articulate a non-discriminatory reason for plaintiff's removal. If defendant carries this burden of production, "the presumption of discrimination [created by plaintiff's prima facie showing] is eliminated, and the plaintiff must submit evidence showing that the articulated reason is pretextual. If pretext is established, summary judgment in favor of the defendant is generally inappropriate." *Walker v. Prudential Property & Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002)(citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000); *Chapman AI Transport*, 229 F.3d 1012, 1025 n. 11 (11th Cir. 2000); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.1997)).

To establish that defendant's articulated reason is a pretext for discrimination, plaintiff must –

> come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the [defendant] were not the real reasons for the adverse employment decision. If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant['s] articulated reasons is pretextual, the [defendant] is entitled to summary judgment on the plaintiff's claim.

*Chapman*, 229 F.3d at 1024-25 (quoting *Combs*, 106 F.3d at 1528-29)(internal citations and quotations omitted).

19

Plaintiff may establish that an articulated reason is a pretext for unlawful discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989)(quoting *Goldstein v. Manhattan Industries*, 758 F.2d 1435, 1445 (11th Cir. 1985)(citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981))). If a plaintiff chooses to establish pretext by showing that his employer's proffered reason is unworthy of credence, he must attack that reason "head on and rebut it." *Chapman*, 229 F.3d at 1030. He must offer evidence that "casts sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Ry. Co.* , 37 F.3d 603, 605 (11th Cir. 1994)); *see also Wascura v. City of South Miami*, 257 F.3d 1238, 1247 (11th Cir. 2001); *Damon v. Fleming Supermarkets Of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). The "pretext analysis focuses on a narrow question: Would the proffered evidence allow a reasonable factfinder to conclude that the articulated reason for the decision was not the real reason?" *Walker*, 286 F.3d at 1276 (citations omitted).

Defendant contends that Granone removed plaintiff from the KE-ASAT Program because "there was evidence uncovered by an audit which indicated that there had been some improprieties in the management of the contract under [plaintiff's] supervision," based on

the activity report indicating that the government paid for contractor's lobbying efforts. (Def.

Mem. in Supp. of Mot. for Summ. J. at 18-19.)  Plaintiff responded:

> There [are] no independent witnesses for the government.  Each individual
> who has submitted an affidavit works for and is rated by one of the major
> defendants.  There is substantial evidence in the record that Jess Granone and
> Costello are simply not telling the truth.  Costello says he had no knowledge
> of [plaintiff's] activities with Congress and [plaintiff] says that Costello
> directed him to go to Congress.  Costello says that he did not 'redirect the KE-
> ASAT Program,' and [plaintiff] says that Costello did redirect the program.
> The redirection cost the taxpayers an additional $25 Million.  Costello has
> been permitted to retire with all pay and allowances even though he cost the
> taxpayers $25 Million and [plaintiff] has been vilified for increasing the
> Army's budget by $137 Million.

(Pl.'s Mem. in Opp. to Mot. for Summ. J. at 9.)

As set forth above, to establish pretext, plaintiff must meet the articulated reason

"head-on and rebut it." *Chapman*, 229 F.3d at 1030.  Moreover, when the court "evaluate[s]

a charge of disparate treatment employment discrimination, [it] must focus on the actual

knowledge and actions of the decision-maker. *Lubetsky v. Applied Card Systems, Inc.*, 296

F.3d 1301, 1306 (11th Cir. 2002)(citing *Walker v. Prudential Prop. & Cas. Ins. Co.*, 286

F.3d 1270, 1274 (11th Cir.2002)(citing *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1105

(11th Cir.2001))), *cert. denied* 537 U.S. 1106 (2003).

Plaintiff has presented no evidence that Costello was involved in the decision to

remove him from the KE-ASAT Program.  Therefore, Costello's lack of credibility on issues

not directly before the court is immaterial.[5]  Moreover, plaintiff's response ignores

---

[5]"'Discrimination is about actual knowledge, and real intent, not constructive knowledge and
assumed intent.' *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir.2001). When

defendant's articulated reason – that he was removed pending a criminal investigation into his possible involvement in a contractor billing the government for its lobbying efforts. Plaintiff has offered no evidence to rebut defendant's showing that the independent audit revealed plaintiff's apparent involvement in certain financial improprieties in the KE-ASAT Program, that such improprieties provoked a criminal investigation, or that the pendency of a criminal investigation was the reason that plaintiff was removed from the KE-ASAT Program.

Therefore, the court finds that plaintiff has not produced sufficient evidence of a disputed issue of fact regarding defendant's articulated reason for his removal from the KE-ASAT Program to withstand defendant's Motion for Summary Judgment. Defendant's Motion for Summary Judgment is due to be granted and plaintiff's discrimination claim with regard to his removal from the KE-ASAT Program will be dismissed.

## B. RETALIATION/SUSPENSION

Plaintiff contends that he was suspended for three days in retaliation for filing a charge of discrimination. For the reasons set forth below, the court finds that plaintiff cannot establish that the adverse decision, his suspension, was caused by his protected activity.

In order to establish a prima facie case of retaliation in violation of Title VII, Plaintiff must establish: (1) a statutorily protected expression; (2) an adverse employment action;

---

evaluating a charge of employment discrimination, then, we must focus on the actual knowledge and actions of the decision-maker. *See Bass v. Board of County Comm'rs*, 256 F.3d 1095, 1105 (11th Cir.2001)." *Walker*, 286 F.3d at 1274.

and (3) a causal link between the protected expression and the adverse action. *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). "The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)(quoting *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir.1998)(quoting *E.E.O.C. v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571-72 (11th Cir.1993)))(internal quotations omitted). "Once a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action. The ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff." *Id.* (citations omitted).

> The Eleventh Circuit has held:
>
> When the biased recommender and the actual decisionmaker are not the same person or persons, a plaintiff may not benefit from the inference of causation that would arise from their common identity. Instead, the plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee."

*Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (1999)(citations omitted), *cert. denied*, 529 U.S. 1053, 120 S. Ct. 1555, 146 L. Ed. 2d 460 (2000). Thus, "a biased intermediary cannot be held liable for the decisionmaker's actions if the decisionmaker was not biased, and the decisionmaker undertook an ***independent evaluation*** of the intermediary's recommendation, then subsequently agreed with the merits of the recommendation." *Hooks*

23

*v. Cohen*, No. Civ. A. 99-D-765-N, 2000 WL 1639583, *4 (M.D. Ala. Oct. 24, 2000) (citing

*Stimpson*, 186 F.3d at 1331-32; *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1251

(11th Cir.1998))(emphasis added).

      The plaintiff, alleging retaliation in a case where the person recommending the

adverse employment action is not the actual decisionmaker, may establish his case by

demonstrating:

> (1) bias existed at some point along the chain, and that the biased employee
> recommended to a higher-ranking official that the official take action against
> [the plaintiff]; *and* (2) each higher-ranking official up the chain of command
> either was biased or acted upon the recommendation without giving it
> sufficient independent consideration; *and* ultimately that (3) the relevant
> decisionmakers . . . either were biased or terminated [the plaintiff] without
> undertaking their own *independent investigation* into the merits of the
> recommendations they were receiving.

*Id.* (emphasis added).

      The evidence shows that Cosumano decided to suspend plaintiff for three days for

"creating a disturbance resulting in an adverse effect on the morale and productivity of [his]

subordinate employees, involving a threat to inflict bodily harm," (doc. 39, Ex. 19 (Notice

of Decision) at 1), based on the independent investigation and binding recommendation of

Urias.  Plaintiff argues that Granone's conduct in re-opening the investigation after Reeves

exonerated him and recommending a seven-day suspension was retaliation.  However,

because Urias conducted an independent investigation and Cosumano based his decision to

suspend plaintiff for three days on the basis of Urias's independent investigation, Granone's

alleged biased reason for re-opening the investigation and recommending a seven-days

suspension cannot be said to be the "cause" of the ultimate adverse action, the three day suspension.[6]

Therefore, plaintiff's retaliation claim based on his three-day suspension is due to be dismissed as a matter of law.

## IV. CONCLUSION

For all of the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law on all of plaintiff's claims. An order granting defendant's motion for summary judgment, (doc. 38), will be entered contemporaneously with this Memorandum Opinion.

**DONE** this __29th__ day of March, 2004.

_Sharon Lovelace Blackburn_
**SHARON LOVELACE BLACKBURN**
United States District Judge

---

[6]Defendant also has a valid argument that the length of time between plaintiff's protected activity and his proposed suspension – four months – is too long to permit an inference of causation. (*See* Def.'s Mem. at 15.)